**Alfred MECHNIG, Plaintiff–Appellant,**

v.

**SEARS, ROEBUCK & CO., Defendant–Appellee.**

No. 87–2431.

United States Court of Appeals, Seventh Circuit.

Argued May 16, 1988.

Decided Dec. 29, 1988.

Rehearing Denied Feb. 27, 1989.

Charles A. Linn, Arnold & Kadjan, Chicago, Ill., for plaintiff-appellant.

---

Arthur L. Klein, Arnstein Gluck Lehr & Milligan, Chicago, Ill., for defendant-appellee.

Before COFFEY, EASTERBROOK and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Alfred Mechnig appeals from the district court's order entering summary judgment in favor of Sears, Roebuck & Co. under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.* We affirm.

I

Alfred Mechnig was employed by Sears, Roebuck & Co. at its Irving Park store in Chicago, Illinois from August 1950 until his termination on August 5, 1982. With the exception of a period from 1979 to April 1981, Mechnig worked as an "outside" plumbing and heating equipment salesman. During the time that Mechnig was employed as an "outside" salesman, these employees were scheduled to work one day a week in the store. The remainder of their work week was spent making sales calls outside the store. At the time of his termination Mechnig was 55 years old.

Sears terminated Mechnig on August 5, 1982, for allegedly violating its time card policies in connection with an incident occurring on Sunday June 27, 1982. On June 27, 1982, Mechnig did not arrive at Sears at the 11:00 a.m. starting time for his scheduled shift in the store. At about 11:15 a.m., Gary Marks, the "hard lines" merchandise manager, observed that Mechnig's department was short of help. Mechnig was called at home and arrived at work around 11:30 a.m. Mechnig was tardy because he apparently had made no effort to ascertain the hours he was to work that week. However, Mechnig also questions whether his scheduled hours were properly posted.

When Mechnig filled out his time card for the week he listed his arrival time on Sunday, June 27 as 11:00 a.m. Mechnig claimed that he had filled out his time card at the end of the week and did not think about the actual time he arrived on June 27. Mechnig recorded 40 hours on his card, in line with his perception, based upon alleged statements of Sears representatives, that, as an "outside" salesman, he should always record 40 hours of time irrespective of the number of hours he actually worked.

Upon reviewing Mechnig's time card, Marks noted the discrepancy between the time recorded on the card and Mechnig's actual arrival time. Marks brought this difference to the attention of store manager, Donald Hawley. Because Mechnig was on vacation from July 4, 1982 to July 20, 1982, Hawley was unable to speak with Mechnig about the time card question until late July 1982.

At that time a meeting was held between Mechnig, Hawley and Hank Steerman, the personnel representative whose responsibilities included the Irving Park store. At this meeting Mechnig did not deny that the starting time stated on his June 27, 1982 time card was in error. He stated that he had probably forgotten what time he reported in, and he felt that the exact number of hours recorded was not of great importance in that he was an "outside" salesman.

Hawley felt that Mechnig's time card inaccuracy warranted his termination, but desired to review Mechnig's personnel file before making a definite termination recommendation. After reviewing the file and discovering a number of written corrective reviews involving previous time card difficulties, Hawley recommended Mechnig's termination. Because Mechnig was an employee with a long period of prior service, Hawley and Steerman discussed the termination with Sears' group personnel manager, Tom Jones. Jones approved the recommendation to terminate Mechnig.

On August 5, 1982, Mechnig was terminated for violation of Sears' time card policy. An exit interview was conducted by the store's operating manager, Norman Kase. Kase read Mechnig a "deficiency" statement which listed the time card violation as the basis for Mechnig's termination. It is clear from the record that Sears justi-

fied its termination of Mechnig on the ground of his time card violation rather than his overall job performance. Mechnig had one of the stronger sales records among the store's "outside" salesmen.

It is not clear from the record whether Mechnig was replaced by a younger person. Sears' answer to an interrogatory states that Mechnig was replaced by Leonard Quick, a 56 year old employee, while Mechnig's deposition indicates that he was ultimately replaced by a number of different individuals, whose ages were not stated.

Some question was raised concerning the parameters of Sears' time card policy for "outside" salesmen. Mechnig asserts that outside salesmen were to record 40 hours on their time cards, irrespective of the actual number of hours worked. He claims that representatives of Sears over the years had told him to record only 40 hours to avoid the payment of overtime.[1] Affidavits and deposition testimony offered from other employees provide some corroboration for Mechnig's position. George Kempf, Mechnig's immediate supervisor at the time of discharge, stated that he would have approved Mechnig's time card because Mechnig was not habitually late and outside salesmen traditionally put in more than 40 hours a week. Kempf further claimed that he would not have recommended Mechnig's discharge, although it is evident that he was not involved in the termination decision. Similarly, another division manager at the Irving Park store,

Robert Wozney, contended that Sears did not want overtime pay, that his outside salesmen would generally put down 40 hours work on their time cards, that he routinely approved their time cards and that the "technicalities" of Sears time card procedures did not "bother us too much." Another division manager at the Irving Park store, Domenick Spoto, stated that it was an unwritten rule that overtime was not recorded. An outside salesman at the Irving Park store, Edward Stracek, asserted that the outside salesmen "were not required to fill in the exact hours worked so long as the hours added up to 40 hours in a week." Store manager Hawley's deposition testimony, taken as a whole, does not support a reasonable inference that the store manager was personally aware of these practices.[2] There is no evidence that Hawley had excused any instance of time card discrepancies of which he had been aware. In fact, Sears had terminated individuals involved in the only other instance of time card falsification found in the record.[3]

Sears disputes Mechnig's claims and asserts that outside salesmen were only to record the hours they actually worked. Language on the timecards states, above the space for the employee's signature: "I have recorded my actual starting and quitting time each day. Any falsification will subject me to dismissal." In addition, Mechnig signed employment agreements in 1971, 1975, 1980 and 1982 which contained the following language: "I agree to record all hours worked, both scheduled and un-

1. There is some dispute as to whether Mechnig's June 27 time card would have entitled him to overtime. However, the overriding concern of Sears officials appears to have been with the accuracy of the actual time card rather than with the overtime payment consequences of any inaccuracy.

2. Mechnig relies upon Hawley's statement at one point in his deposition that he knew of instances of outside salesmen recording 40 hours of work, when they had actually worked more hours. However, it is quite possible that Hawley may have misspoken, because he explained that outside salesmen took this action in accordance with written company policy requiring them to record the actual number of hours worked. Such a policy would have required the

opposite result. Shortly thereafter Hawley specifically stated that "I have no knowledge of any outside salesperson working more than 40 hours and not recording it on their time card." Hawley then testified twice that he had made no personal investigation of whether outside salesmen engaged in this practice. The overall thrust of Hawley's testimony points toward a lack of awareness of deviations from the written time card policy. Furthermore, his isolated statement of knowledge, even if it was his intended answer, does not indicate that Hawley became aware of deviation from the time card policy prior to the critical point in time when he decided to terminate Mechnig.

3. These employees were both within the protected class.

scheduled, on my time card in the appropriate space. Failure to record my hours worked is a violation of the Fair Labor Standards Act as well as Company Policy."

Sears had a record of attempting to correct Mechnig's time card problems. As early as October 21, 1968, Mechnig was advised that he was required to punch in on the time clock for hours scheduled in the store and that further problems along these lines would make him "subject to dismissal from the company." A December 3, 1977, statement noted the following problem as one of several discussed with Mechnig: "Time cards will be properly filled out showing actual hours worked, scheduled and unscheduled."[4] On November 28, 1978, a notation was placed in Mechnig's file stating that Mechnig had come in at 9:30 a.m. and had entered 9:00 a.m. on his time card. The document stated that this conduct could not continue. This document was not signed by Mechnig. Mechnig was spoken with twice in 1979 concerning time card problems. On September 24, 1979, Mechnig was corrected for writing his time on the time card rather than using the time clock. One day later, on September 25, 1979, Mechnig was punched out at 6:10 p.m. even though he had been seen leaving the store several hours earlier. He had gone to a wedding. Mechnig remembers being spoken to at that time concerning leaving early, but not concerning his time card. On November 5, 1979, Mechnig was warned that continuation of various sorts of conduct engaged in earlier in 1979, including the time card incidents, could lead to his termination.

Mechnig presented statistical evidence in the form of an analysis of the sales employees at all Sears stores in the Chicago area who left their positions in 1981 and 1982. Mechnig's statistical expert, Robert Malone, prepared tables showing that, particularly in the full-time employee group of which Mechnig was part, persons over 40 made up a higher proportion of those terminated than of those who voluntarily separated. These tables did not include out-side salesmen such as Mechnig. Further, most of the tables classified as terminated those employees who elected voluntary retirement, pursuant to Sears' program of providing older employees with ten weeks of pay upon leaving the company. One table excluded voluntarily retired employees from either the terminated or voluntarily separated category. That table, consisting exclusively of full time employees, also showed a higher proportion of persons over 40 among those terminated than among those who voluntarily separated. None of the tables included voluntarily retired employees in the voluntarily separated category. In his deposition Malone stated that if voluntary retirees were excluded from the tables in which they had been included, there would no longer be a higher percentage of employees over 40 terminated rather than voluntarily separated, except in a case when full-time employees were isolated. However, even in the case of an isolated sample of full-time employees, the number of terminated employees over 40 would be very radically decreased, with a resulting large decrease in the percentage difference between terminated and voluntarily separated employees Dr. Malone relied upon to support Mechnig's claim of age discrimination. Dr. Malone also stated that, based on civil service studies, he would expect persons over 40 to separate at a lower frequency than persons under 40, although he was unaware of the pattern one would expect to see among Sears employees absent age discrimination.

Additionally Mechnig offered a variety of employee and former employee opinions concerning Sears' attitude toward older employees. Mechnig, himself, asserted that Sears was attempting to rid itself of older employees through various means. Sears allegedly would make impossible demands of employees and then blame the employee when he could not fulfill the demands. Older employees would be moved from department to department, as a means of harassment. Mechnig admitted that

---

**4.** Scheduled hours are hours worked inside the store, unscheduled hours are hours worked out-side the store.

younger employees were also subject to such treatment, but transfers were not of as much concern to younger employees as they were to older employees. More importantly, Mechnig claimed that Sears was attempting to cut costs by freeing itself of the higher salary and benefit packages available to full-time older personnel. George Kempf, Mechnig's former division manager, contended that, beginning in 1980, Sears adopted a policy of closer supervision at the Irving Park store which resulted in the termination or resignation of many employees over 40. Between 1980 and 1984 the number of division managers was reduced from 30, virtually all of whom were over 40, to 16. Robert Wozney, another division manager at the Irving Park store, also noted a reduction in full time employees. He stated that 35 division managers were reduced to 10. However, many of these persons were absorbed into other positions at Sears and most of the remaining division managers were over 40. Still, no full time employees had been hired since 1978. Wozney felt that Sears wanted to rid itself of full time employees and managers, most of whom were over 40, but stated that, irrespective of age, store manager Hawley no longer wished to employ persons on a full time basis. This could lead one to believe Mechnig's claim that Sears wished to reduce its health, pension and benefit obligations. Another Irving Park division manager, Domenick Spoto, regretted the more formal managerial style of store manager Hawley. He noted a lack of concern for the employees.

In concluding that the evidence Mechnig presented did not raise a genuine issue of material fact concerning whether Sears' reason for terminating Mechnig was a pretext for discrimination, the district court considered each of the major sources of evidence Mechnig offered. After noting the deficiencies in each evidentiary offering, the district court concluded that Mechnig "has failed to present evidence that Sears' proffered reason for terminating [him] was a pretext for age discrimination. [Mechnig] presented no evidence that Sears had retained younger outside salesmen who falsified their timecards so as to obtain overtime pay."

## II

In this case we are presented with the "application of ... disparate treatment methodology in the context of a summary judgment." *Williams v. Williams Electronics*, 856 F.2d 920, 922 (7th Cir.1988). In a previous review of a grant of summary judgment in this context, we observed:

"A motion for summary judgment should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing a grant of summary judgment, we must view the record and all inferences drawn therefrom in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Illinois v. Bowen*, 808 F.2d 571, 574 (7th Cir.1986). However, when confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations that there is a *genuine* issue of material fact which requires trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party must do more than simply 'show that there is some metaphysical doubt as to the material facts.' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted). 'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party there is no "genuine" issue for trial.' *Id.* at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). The court should neither "look the other way" to ignore genuine issues of material fact, nor "strain to find" material fact issues where there are none....' *Secre-*

*tary of Labor v. Lauritzen,* 835 F.2d 1529, 1534 (7th Cir.1987) (quoting *Mintz v. Mathers Fund, Inc.,* 463 F.2d 495, 498 (7th Cir.1972))."

*Beard v. Whitley County, REMC,* 840 F.2d 405, 409–410 (7th Cir.1988).

"In determining whether a genuine issue of material fact is present we must consider both the substantive law of employment discrimination and the burdens of proof applicable under this law." *Williams,* 856 F.2d at 922. As we noted in *Grohs v. Gold Bond Building Products,* 859 F.2d 1283, 1285 (7th Cir.1988): "[T]he critical issue in age discrimination suits is not whether [the plaintiff's] age was the sole factor [motivating the employer's decision], but rather, whether age was a 'determining' factor, in that plaintiff would not have been discharged *but for* his age." (Emphasis in original). As we also observed in *Grohs,* an age discrimination

> "plaintiff may meet his burden of persuasion at trial in one of two ways. First, he may meet it directly, by presenting direct or circumstantial evidence that age was a determining factor in his discharge. Second, he may meet it indirectly by utilizing a variation of the Supreme Court's burden-shifting analysis for resolving Title VII cases."

859 F.2d at 1285. Because Mechnig does not rely upon the direct method of proof, we turn to whether he has satisfied his burden under the indirect proof scheme.

In the indirect method of proof, as an initial matter, "the [employee] has the burden of proving by the preponderance of the evidence a prima facie case of discrimina-

tion." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–253, 101 S.Ct. 1089, 1093–1094, 67 L.Ed.2d 207 (1981). In the case of an alleged age based termination, the "employee must show (1) that he belongs to the protected class, (2) that his job performance was sufficient to meet his employer's legitimate expectations, (3) that he was discharged in spite of his performance, and (4) that the employer sought a replacement for him." [5]

When a prima facie case has been demonstrated, "the burden shifts to the [employer] 'to articulate some legitimate nondiscriminatory reason' " [6] for its action. "This burden is only one of production, as the 'ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the [employee] remains at all times with the [employee].' " *Williams,* 856 F.2d at 923 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093).

If the employer satisfies its production burden, the employee has "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093 (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973)). The employee may make this showing of pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

---

**5.** *Kier v. Commercial Union Insurance Companies,* 808 F.2d 1254, 1257 (7th Cir.1987). There is some inconsistency in our cases concerning the element "that the employer sought a replacement for" the employee. Three cases state this requirement in the same general fashion outlined in *Kier. See Graefenhain v. Pabst Brewing Co.,* 827 F.2d 13, 17 n. 5 (7th Cir.1987); *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 462 (7th Cir.1986); *La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1409 (7th Cir.1984). Another three cases include a more stringent requirement that the employee be "replaced by a younger person." *See Grohs,* 859 F.2d at 1286; *Metz v. Transit Mix, Inc.,* 828 F.2d 1202, 1204 (7th Cir.1987); *Huhn v. Koehring*

Co., 718 F.2d 239, 243 (7th Cir.1983). We need not resolve this apparent conflict. Our determination on the question of Mechnig's presentation of a genuine issue of material fact concerning whether Sears' reasons were pretexts for discrimination means that the question of whether Mechnig demonstrated a prima facie case will not determine the outcome of this matter.

**6.** *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)).

We have stated that the employee may demonstrate that the employer's reasons are unworthy of credence through evidence "showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, *or* (3) that they were insufficient to motivate discharge." *Kier v. Commercial Union Insurance Companies*, 808 F.2d 1254, 1259 (7th Cir.1987) (emphasis in original). Under either means of proving pretext the employee

> "need not prove that age was the only factor motivating his discharge, but he must prove that age was 'a determining factor,' *Smith v. Flax*, 618 F.2d 1062, 1066 (4th Cir.1980), 'in the sense that he would not have been discharged "but for" his employer's motive to discriminate against him because of his age.' *La Montagne [v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984) ]."

*Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986) (citation omitted).

 The parties do not contest that Mechnig and Sears respectively satisfied the first two elements of the disparate treatment proof allocation scheme. Mechnig demonstrated a prima facie case of age discrimination by showing that he was over 40, that he was generally performing his work in a satisfactory manner, that he was terminated and that Sears sought a replacement for him.[7] Likewise, Sears articulated a legitimate non-discriminatory reason for Mechnig's termination when it asserted that Mechnig was dismissed for violating Sears' time card policies, which are rooted in basic concerns about employee dishonesty.

 The summary judgment decision in this case, thus, turns upon whether there exists a genuine issue of fact material to the question of whether the ground Sears articulated for Mechnig's termination was a pretext for discrimination. Mechnig attempts to show pretext both through evidence that the employer's explanation was unworthy of credence and through evidence that the employer's action was more likely motivated by age discrimination.

With respect to the credence to be attached to Sears' explanation for Mechnig's discharge, we again note that we do "not sit as a super-personnel department that reexamines an entity's business decisions." *Dale*, 797 F.2d at 464. "No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the ADEA does] not interfere." *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir.1987). Rather, our inquiry is limited to "whether the employer gave an honest explanation of its behavior." *Id.*

Mechnig has not made any one of the three types of showings which our decision in *Kier* stated would be sufficient to demonstrate that Sears' reason for its action was unworthy of credence. 808 F.2d at 1259 (Proof that employer's explanation is unworthy of credence may be based on evidence "showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, *or* (3) that they were insufficient to motivate discharge"). As an initial matter, Mechnig's time card falsification clearly had a basis in fact. Mechnig, himself, admitted that his time card was inaccurate.

Mechnig, however, contends both that Sears' termination decision was not motivated by his time card violation and that his time card violation was insufficient to motivate this decision. There appears little

---

7. Two points relevant to Mechnig's prima facie case presentation should be briefly noted. First, "[a] determination that an individual is performing a job well enough to meet an employer's legitimate expectations, when made in the context of a prima facie case, may be based solely upon the employee's testimony concerning the quality of his work." *Williams*, 856 F.2d at 923 n. 6. Second, our prima facie case determination in this matter is based upon the less stringent formulation of the prima facie case described at n. 5, *supra*. There might be some question as to whether Mechnig demonstrated a prima facie case if he was required to prove that he was replaced by a younger person. However, as was also noted at n. 5, *supra*, it is unnecessary to resolve this difficulty because the question of Mechnig's satisfaction of the prima facie case requirement does not determine the outcome of this proceeding.

question from the evidence that the officials making the discharge decision focused upon Mechnig's time card falsification in their decision making process. Mechnig attempts to avoid this difficulty by arguing that these concerns were insufficient to motivate discharge because Sears' outside salesmen routinely entered hours which did not reflect the actual time worked and Sears time card policy, in practice, required only that the weekly hours listed on the timecard not exceed 40. Thus, Mechnig argues that strict adherence to the time card falsification policy in his case was a pretext for age discrimination. We addressed a similar question in *Friedel v. City of Madison*, 832 F.2d 965, 974 (7th Cir.1987). There we observed:

"[T]he Department would not be liable even if it had misapplied its own policy and arbitrarily or erroneously dismissed the plaintiffs. The question is instead whether there is any evidence of discrimination against the plaintiffs based on their race or gender. If the Department used its cheating policy as a pretext to discriminate against the plaintiffs ... the department would be liable. While it is up to an individual employer to decide what disciplinary action cheating deserves, the criterion for making such a decision must be ' "applied, alike to members of all races" and Title VII is violated if ... it is not.' *McDonald [v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 278–80, 96 S.Ct. 2574, 2580, 49 L.Ed.2d 493 (1976) ].

"Plaintiffs have indeed alleged that the Department treated similar cheating situations involving minority or female recruits dissimilarly. Plaintiffs argue that 'female and minority recruits also engaged in nearly identical conduct' to that of plaintiffs. In order to reach a jury on this question the plaintiffs needed only to offer specific facts suggesting that the police knew that other recruits were involved in cheating to the same extent as the plaintiffs. The plaintiffs have not, however, provided *any specific facts* that even arguably suggest that the police knew that minority or female recruits were engaged in acts against the employ-er of 'comparable seriousness,' to the acts of plaintiffs. Plaintiffs have failed to support their bare contention that the police knew of such recruits, and the mere *belief,* without any factual support, that the police knew of such recruits and failed to discharge does not establish a genuine issue of material fact."

(Emphasis in original, citations omitted).

Although Mechnig has introduced a great deal of factual material relevant to time card practices at Sears, his evidence does not bear in any significant manner upon the question of whether Hawley and the other individuals involved in Mechnig's termination were aware of time cards being improperly completed and administered Sears clear time card falsification policy in a discriminatory manner. Nearly all of the evidence supplied was from employees and lower level supervisors who were uninvolved in the termination decision. None of this evidence clearly implies that those who made the choice to terminate Mechnig knew of younger employees falsifying time cards and treated these employees more favorably than Mechnig. Indeed the evidence does not demonstrate that store manager Hawley or anyone else involved in the termination decision, was aware of or had investigated time card practices of other employees prior to Mechnig's termination. In addition, Mechnig had been subject to previous corrective action concerning time card inaccuracies. The presence of such action casts doubt on Mechnig's contention that Sears was unconcerned with the accuracy of his time cards. Indeed, the only other documented instance of time card falsification in the record resulted in discharges. In addition, all the statements and documents made by persons involved in the termination decision indicated that the time card violation was the reason for Mechnig's termination. It is clear from the record that the evidence Mechnig presented was insufficient for a reasonable factfinder to rule that Sears' position that Mechnig was terminated for his time card violation was unworthy of credence.

Mechnig also presented evidence which was intended to demonstrate that age more

likely motivated Sears' termination decision. This evidence basically consisted of statements by former Sears salesmen and department managers that full time employees at the Irving Park store, a group predominantly over 40, were more intensively supervised following Hawley's installation as store manager, that many of these employees had left Sears, that the number of department managers, another group predominantly over 40, had been reduced and that full time employees were no longer hired at the store. Mechnig and others attributed this action to Sears desire to avoid paying the salaries and benefits required for the older full-time employees.

While we have previously determined that an employer violates the ADEA if it terminates older employees because of higher salary and fringe benefits, we also made clear that this ruling does not leave an employer powerless in addressing the economic impact associated with payments required to be made to older employees. *See Metz v. Transit Mix, Inc.*, 828 F.2d 1202, 1210–1211 (7th Cir.1987). Indeed, we have held that voluntary retirement incentive programs, which help an employer reduce the benefits required to be paid to older employees, do not themselves constitute age discrimination. *See Henn v. National Geographic Society*, 819 F.2d 824, 828–829 (7th Cir.1987). The mere fact that many older Sears employees took advantage of Sears' voluntary retirement program and left its employ does not raise an age discrimination problem.[8] Further, the reduction in the number of division managers is not itself indicative of age discrimination. The testimony of Mechnig's own witnesses indicated that former managers were generally absorbed elsewhere on Sears' payroll. Reducing the number of managerial employees can be a legitimate business decision, as can a decision to hire less costly part-time employees instead of full-time employees. Certainly an employer may not harass older employees. How-

ever, a change in managerial styles is not age discrimination unless older employees are singled out for harassment. Although there were general assertions to the effect that full-time employees were more closely supervised than part-time employees, there were not the specific factual examples of differential treatment of older and younger employees necessary to raise a genuine issue of material fact on this question. *See Friedel*, 832 F.2d at 974; *Dale*, 797 F.2d at 464–465.

Mechnig's statistical evidence also did not prove a great deal. The statistics exclude outside salesmen like Mechnig. They also generally treat voluntarily retired employees as terminated, an analysis contrary to our reasoning in *Henn*. In light of these problems, the figures do not broadly confirm a general conclusion that Sears treated older employees adversely.

Even if Mechnig's evidence could cause one to question Sears' general pattern of treatment of older employees, our inquiry is much more limited. We need only to determine whether this evidence was sufficient to raise a genuine issue of material fact concerning the question of whether Mechnig's termination was more likely motivated by age or whether Sears' reliance on his time card violation was unworthy of credence. In light of the many permissible business explanations for Sears' actions toward full-time employees, the weak quality of Mechnig's statistical evidence and Sears' clear good faith reliance upon its time card policy, we do not believe that Mechnig presented sufficient evidence to support a factfinder's decision in his favor on the question of whether Sears' articulated reason for his discharge was a pretext for discrimination. We are convinced that a reasonable factfinder would be unable to conclude that Mechnig would have been spared termination "but for" Sears' alleged intent to discriminate on the basis of age.

8. Mechnig labels Sears' voluntary retirement program a "severance" program, probably because of the limited nature of its benefits. This attempted semantic distinction is unpersuasive. Certainly the question of compliance with the ADEA does not depend upon the amount of economic benefit an employee receives in exchange for voluntary retirement. *See generally Henn*, 819 F.2d at 829 (Violation of ADEA turns upon employer's conduct prior to voluntary retirement and not upon existence or content of voluntary retirement package).

Thus, Mechnig did not raise a genuine issue of material fact as to the question of whether Sears discriminated against him because of his age, and the district court's entry of summary judgment in favor of Sears is

AFFIRMED.