**Carlton PUGH, Plaintiff,**

v.

**The STATE OF WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Richard Fox, Evelyn Kois, Richard Pomo, Dorothy Rymer, and Candace Richards, Defendants.**

**Civ. A. No. 89–C–0259.**

United States District Court,
E.D. Wisconsin.

Oct. 29, 1990.

Carlton Pugh, pro se.

Nadim Sahar, Milwaukee, Wis., David Hoel, Madison, Wis., Asst. Attys. Gen., for defendants.

## DECISION AND ORDER

REYNOLDS, Senior District Judge.

### BACKGROUND

On March 6, 1989, pro se plaintiff Carlton Pugh ("Pugh") an African–American filed a complaint in this court against the State of Wisconsin Department of Natural Resources ("DNR") alleging that the DNR discriminated against him because of his race in violation of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. § 2000e et seq. Specifically, Pugh alleges that Richard Fox ("Fox"), Director of Program Services, fired him in March, 1986 because he is an African–American. In his complaint, Pugh also named Fox, Evelyn Kois ("Kois"), Dick Pomo ("Pomo"), Dorothy Rymer ("Rymer"), and Candace Richards ("Richards") as additional defendants.

Pugh claims that Kois and Rymer conspired with Fox to fire him because of his race (Complaint at III ¶ 6) and that Pomo and Richards, who were affirmative action officers for the DNR at the time, refused to intervene to prevent his termination (Complaint at III ¶ 9). Pugh specifically alleges that each of the individual defendants acted under the color of law; therefore, this court construed his complaint to include a Title 42 U.S.C. § 1983 claim that these individuals violated his fourteenth amendment right to equal protection of the law. Pugh requests that this court order the DNR to reinstate him to the position he held prior to his termination and award him back pay, compensatory and punitive damages.

On May 22, 1990, the defendants moved this court for summary judgment on Pugh's § 1983 claim on the ground that Pugh's complaint is an improper collateral

attack on the Wisconsin Personnel Commission's ("WPC") September 26, 1988 decision and order. In addition, the defendants initially argued that Pugh's Title VII claim was barred by preclusion because the § 1983 action was barred and Pugh waived his right to a jury trial. This court stayed the motion for summary judgment and conducted a trial to the court from May 29, 1990, to May 31, 1990. In light of this court's decision to stay defendants' summary judgment motion, this court also withheld a decision as to which of the claims, if any, the trial would apply to.

At the conclusion of the trial, the defendants submitted a trial brief in which they reargued that the WPC decision has preclusive effect over Pugh's § 1983 claim. The defendants, however, changed their position regarding the effect of the WPC decision on Pugh's Title VII claim, and now state that the WPC decision does not preclude this claim. On June 11, 1990, Pugh filed with this court a trial brief and a brief in opposition to defendants' motion for summary judgment. This court has reviewed the briefs and grants Fox, Kois, Pomo, Rymer, and Richard's motion for summary judgment in their favor on Pugh's § 1983 claim. Accordingly, the trial only pertains to Pugh's Title VII claim against the DNR.

During the trial, Pugh met his initial burden of showing that there was a prima facie case of discrimination. The DNR then met its burden of producing evidence that indicated that it believed that there was a legitimate, nondiscriminatory reason for terminating Pugh. Finally, although Pugh was successful in revealing that the DNR's reason for firing him may have been based on faulty information, there was no evidence that race discrimination was a determining factor in the DNR's decision. Thus, this court will enter a judgment in favor of the DNR on Pugh's Title VII claim against it.

1. This court notes that Pugh claims that the WPC ignored testimony which indicated that the reason Fox gave for Pugh's termination, the falsifying of time reports for days when Pugh did not work, was not supported by the evidence. The WPC finding, however, specifically

## ANALYSIS FOR PUGH'S § 1983 CLAIM

■ In *Univ. of Tennessee v. Elliot*, the United States Supreme Court held:

that when a state agency "acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," federal courts *must give the agency's factfinding the same preclusive effect to which it would be entitled in State's courts.*

478 U.S. 788, 799, 106 S.Ct. 3220, 3226, 92 L.Ed.2d 635 (1986) (quoting *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966)) (citation omitted) (emphasis added). Defendants Fox, Kois, Pomo, Rymer, and Richards moved this court for summary judgment on Pugh's § 1983 claim against them on the ground that the Court's decision in *Elliot* requires this court to give preclusive effect to the WPC's September 26, 1988 decision.

First, the WPC decision involved the identical issues as Pugh's current complaint: 1) Was race discrimination against Pugh a determining factor in Fox's decision to fire Pugh? and 2) Was race discrimination against Pugh a determining factor in the DNR's Affirmative Action office's refusal to intervene to prevent Pugh's termination? (Sept. 26, 1988 WPC Decision and Order, Case No. 86–0059–PC–ER at 1). Second, the WPC decision indicates that: 1) the WPC was acting in a judicial capacity (*Id.*); 2) Pugh's race discrimination claim was properly before it (*Id.* at 6); and 3) Pugh had an adequate opportunity to litigate his claim.[1] Finally, the Seventh Circuit has stated that it is convinced that Wisconsin courts would follow the generally accepted rule that final administrative agency decisions have preclusive effect over those claims which the agency adjudicated. *Patzer v. Bd. of Regents of Univ. of Wisconsin System*, 763 F.2d 851, 857 n.

considered Pugh's evidence that he had been at work on the days which Fox claimed Pugh had falsified his time reports, and concluded that Pugh had not shown that his termination was racially motivated (Sept. 26, 1988 WPC Decision and Order, Case No. 86–0059–PC–ER at 10–11).

5 (7th Cir.1985). Thus, this court concludes that for the purpose of deciding Pugh's § 1983 claim the WPC's findings of fact must be given preclusive effect.

The Supreme Court has stated that in a § 1983 claim based on discrimination "relief is authorized only when there is proof or admission of intentional discrimination." *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 583 n. 16, 104 S.Ct. 2576, 2590 n. 16, 81 L.Ed.2d 483 (1984) (citing *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). In addition, the Seventh Circuit has held that:

> The Equal Protection clause of the Fourteenth Amendment is violated only if the defendants have acted with a discriminatory purpose or intent. This discriminatory purpose or intent may be established by proof of the systematic exclusion of persons because of race or the unequal application of a law, policy or system.

*Minority Police Officers Ass'n v. South Bend*, 801 F.2d 964, 966–67 (7th Cir.1986) (citations omitted). In the present case, the WPC findings of fact indicate that their was no evidence that race was a determining factor in either Fox's decision to terminate Pugh or in Pomo's decision not to have the Affirmative Action Office prevent the termination (Sept. 26, 1988 WPC Decision and Order, Case No. 86–0059–PC–ER). Thus, this court finds that the individual defendants did not act with a discriminatory purpose or intent in regards to Pugh's termination, and summary judgment for the defendants on Pugh's § 1983 claim is granted.

### ANALYSIS FOR PUGH'S TITLE VII CLAIM

■ The United States Supreme Court in *Elliot* held that a state administrative determination that has not been reviewed by a state court has no preclusive effect on a plaintiff's Title VII complaint. 478 U.S. at 796, 106 S.Ct. at 3224–25. This rule of law is true even if the plaintiff's Title VII complaint is based on the same issue or issues which were adjudicated by the state administrative agency. *Id.* Thus, the Court's holding in *Elliot* requires this court to consider Pugh's Title VII claim against the DNR de novo.

■ The WPC decision, however, is admissible as evidence and can be accorded as much weight as this court deems appropriate. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 60, 94 S.Ct. 1011, 1025, 39 L.Ed.2d 147 (1974). Each of the factual findings made by the WPC was fully supported by the testimony and exhibits which were entered into evidence during Pugh's trial before this court from May 29th to May 31st. Thus, this court adopts the WPC's findings of fact as the findings of this court.

I.  Findings of Fact

The WPC found:

1. Complainant is a black male who has both an arrest record and a conviction record.

2. In April of 1984, complainant was hired by respondent as a limited term employe for performing certain records management duties, including purging, setting up and cataloging of department files. The hiring decision was made by Richard Fox, Director of respondent's Bureau of Program Services. At the time he hired the complainant, Mr. Fox was unaware of complainant's arrest/conviction record.

3. During the entire period he worked for respondent, prior to his termination on March 17, 1986, complainant worked as an LTE in the respondent's central file room with one co-worker, Ms. Arloween Oyen. Ms. Oyen's desk is situated adjacent to the only entrance to the central file room and except for several, relatively brief, periods during the day, Ms. Oyen was usually working at her desk. The complainant had a habit of greeting Ms. Oyen when complainant arrived for the work day.

4. Because he was an LTE during the entire 2–year period he worked for the respondent, the complainant was re-

quired to fill out bi-weekly timesheets indicating the number of hours he had worked on each day. At the bottom of each sheet, there was a space for the employe to sign and date the timesheet, certifying that the information on the sheet was "true and just." Once the timesheet has been signed by the supervisor, the information is transferred for use by the payroll office for the purpose of issuing paychecks.

5. Mr. Fox was unaware that complainant had an arrest/conviction record until the spring of 1985 when the complainant was arrested for armed robbery. After he returned to work, the complainant voluntarily discussed his arrest with Mr. Fox.

6. Commencing in December of 1985, Ms. Evelyn Kois, Chief of General Services in the Bureau of Program Services, first assumed responsibilities over the records management unit.

The records management unit consisted of complainant, Ms. Oyen and Ms. Dorothy Rymer who was designated leadworker. Ms. Rymer's work site was in a location other than the central file room. At the time, Ms. Rymer had responsibilities for directing complainant's work and reviewing his timesheets. Ms. Rymer informed Ms. Kois that Ms. Rymer was having difficulty directing complainant's work and that she had a feeling that complainant's timesheets were not accurate.

7. Ms. Kois decided to independently verify the information on subsequent timesheets submitted by the complainant. Verification was accomplished by having both Ms. Rymer and Ms. Kois maintain their own logs of contacts they had with the complainant, by checking (by telephone) with Ms. Oyen whether the complainant was in (or had been in) his office that day, by checking complainant's desk to see if he was there and by checking other places in the building to see if complainant was present. Ms. Kois directed Ms. Rymer to inform the complainant that he should be careful about reporting his work time and Ms. Kois

directed complainant not to work on Saturdays or after 4:30 p.m.

8. Complainant had a habit of arriving to work late. He arrived "whenever [he] decided to come in." After working on February 26, 1986, complainant "left on a jaunt" and did not return to work until March 10, 1986.

9. Complainant was arrested again in December of 1985 or January of 1986 on an assault charge. At the request of complainant's attorney, Mr. Fox visited the complainant in jail. Mr. Fox advised the complainant that his position was being held open for him. Upon his release from jail, complainant returned to work for respondent.

10. On February 14, 1986, complainant filed a timesheet covering the period from February 2 through February 15, 1986. On the timesheet, complainant claimed a total of 80 hours worked, including 4 hours on Saturday, February 15. On February 27, 1986, complainant was issued a check at his normal hourly rate for the 80 hours of work claimed.

11. On or about February 26, 1986, complainant filed a timesheet covering the period from February 16 through March 1, 1986. On the timesheet, complainant claimed a total of 64 hours worked, including 4 hours on Sunday, February 16, 8 hours on Monday, February 17 and 8 hours on Friday, February 21. Once this timesheet was turned in, it was compared with the logs maintained by Ms. Kois and Ms. Rymer. They concluded that complainant had not been at work on February 17 or 21 and that there was no record that he had used an access card for entry to (an[d] exit from) the building on February 16. Because complainant was away from work at the time of the review, Mr. Fox decided to have a paycheck issued to the complainant for those hours which could be verified. A paycheck was issued on March 13, 1986 for 48 hours.

12. On March 14, 1986, complainant filed a timesheet covering the period from March 2 through March 15. On the timesheet, complainant claimed a total of 35½ hours including 7½ hours on Mon-

day, March 10. Ms. Kois and Ms. Rymer reviewed their logs and concluded that while complainant had met with Ms. Rymer in the afternoon, he had not been present in the morning.

13. On Monday, March 17, 1986, complainant met with Ms. Rymer, Ms. Kois and Mr. Fox. Complainant was advised that there were discrepancies between his timesheets and various other information as to Saturday, February 15; Sunday, February 16; Monday, February 17; Friday, February 21; and Monday, March 10. Because complainant indicated that he had an access card for entry to the office building over the weekend and because he said that he could have entered the building on the 15th and 16th at the same time that someone else had opened a door using *their* access card, respondent accepted complainant's timesheets for the 15th and 16th and he was credited with having worked on those dates. Mr. Fox informed the complainant that his employment was being terminated. Mr. Fox invited the complainant to provide some documentation or witnesses to verify his presence on the remaining dates, which would cause him to rescind the termination. While complainant did state that he could provide such verification, he failed to do so other than later producing a calendar which had certain times pencilled in on the dates in question. Mr. Fox concluded that the calendar was not credible verification.

14. Until the hearing in this matter, held over 2 years after the termination decision, complainant never provided respondent with the identity of witnesses who could verify his presence on some of the dates in question, other than the name of Arloween Oyen, who had already been contacted by Ms. Kois or Ms. Rymer on each of the days in question.

15. Complainant was present at his work site on February 21, 1986 and during the morning of March 10, 1986.

16. During the March 17th meeting, none of the persons present used any words or phrases that were derogatory of complainant's race or made any reference to complainant's arrest/conviction record.

17. After the March 17th meeting had ended, complainant went to the respondent's affirmative action (AA) office and verbally complained about his termination. The AA officer, Dick Pomo, subsequently spoke with Mr. Fox to determine whether or not the termination raised an affirmative action issue. Mr. Pomo did not find fault with the decision to terminate the complainant.

## II. Legal Conclusions

■ In *Jones v. Jones Bros. Const. Corp.*, the Seventh Circuit set forth the analytical framework for a Title VII complaint. 879 F.2d 295, 299 (7th Cir.1989). This framework is identical to that which the United States Supreme Court outlined in *Texas Dep't of Community Affairs v. Burdine:*

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted).

In addition, the Seventh Circuit has held that:

> A discharged plaintiff can ordinarily establish the *prima facie* case by showing: (1) she was a member of a protected class; (2) she was satisfactorily performing the duties of her position; (3) she was discharged; and (4) her employer sought a replacement for her. These elements may be adjusted to fit differing factual situations.

*Jones*, 879 F.2d at 299. This court finds that Pugh has met his burden of establishing a prima facia case of discrimination because: (1) Pugh, as an African–American, is a member of a protected class, (2) the DNR did not claim Pugh was terminated because his work was unsatisfactory; and (3) Pugh was discharged by the DNR.

Once a prima facie case is established, the defendant has the burden of rebutting the presumption of discrimination by producing evidence that indicates there was a nondiscriminatory reason for rejecting the employee. *Texas Dep't of Community Affairs*, 450 U.S. at 254, 101 S.Ct. at 1094. This court finds that the DNR met its burden of producing evidence that it had a nondiscriminatory reason for discharging Pugh, e.g. Pugh's supervisors sincerely believed that he had falsified his time sheets.

Finally, the plaintiff has the opportunity to prove by the preponderance of the evidence that the proffered reason was not the true reason for the employment decision, but instead a pretext for discrimination. The Supreme Court has held that a plaintiff can fulfill this burden of persuasion;

> either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Texas Dep't of Community Affairs*, 450 U.S. at 256, 101 S.Ct. at 1095. The Seventh Circuit has elaborated on how a plaintiff can prove that the defendant's proffered reasons are unworthy of credence, and held that this can be accomplished:

> by showing that (1) they have no basis in fact, or (2) they did not actually motivate the employer's decision, or (3) they were insufficient to motivate the discharge [decision].

*Jones*, 879 F.2d at 299. In addition, the Seventh Circuit has held that regardless of how a plaintiff proves the proffered reasons are unworthy of credence, he or she must also prove that discrimination was a determining factor in the defendant's decision:

Under either means of proving pretext the employee

> "need not prove that age [race] was the only factor motivating his discharge, but he must prove that age [race] was 'a determining factor,' *Smith v. Flax*, 618 F.2d 1062, 1066 (4th Cir.1980), 'in the sense that he would not have been discharged "but for" his employer's motive to discriminate against him because of his age [race].' *La Montagne [v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984) ]."

*Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988). This court finds that Pugh has not met his burden of persuading this court that the preponderance of the evidence indicates that the reasons the DNR provided for firing him are not credible, and that a discriminatory reason was a determining factor in the DNR's decision.

During the trial, Pugh testified that there were five racial incidents which evidenced that race discrimination was a determining factor in the DNR's decision to discharge him. The first incident involved comments a Mr. Zaug allegedly made to Pugh concerning Pugh having no rights at the DNR. The veracity of this alleged incident, however, is inapposite because Pugh has never alleged, and there is no evidence which suggests, that a Mr. Zaug was in any way involved in the decision to terminate Pugh.

The second incident Pugh testified to was that Ms. Oyen, Pugh's co-worker and part-time office mate, did not pick up a document which someone had left for Pugh in his office. Pugh believed that she did not handle the document because Pugh is an African–American. This incident, however, also is inapposite because Pugh has never alleged, and there is no evidence which suggests, that a Ms. Oyen was involved in making the decision to discharge Pugh.

The third incident Pugh testified to was that a Ms. Joan Kestersen (phonetic) allegedly told Pugh that a Mr. Olson, "his master," had called him. This incident also is

inapposite because Pugh has never alleged, and there is no evidence which suggests, that a Ms. Kestersen was in anyway involved in the decision to terminate Pugh.

The fourth incident Pugh testified to was that while he was eating lunch in the DNR cafeteria, he heard a woman, who he did not know, ask some other people, who he also did not know, "how the niggers were doing?" Pugh claims that after this unknown woman made her statement, she saw Pugh which prompted her to say "I mean how are the black LTEs (Limited Term Employees) doing?" Although these alleged statements are condemnable, they are not evidence that the DNR discharged Pugh because he is an African–American.

Finally, Pugh testified that during the March 17, 1986 meeting at which he was terminated, Fox told him that he was not the "right boy" for the job. This allegation is important because Fox was the individual ultimately responsible for discharging Pugh, and if Fox had made this statement, then there would be some evidence that race might have been a factor in his decision. Both Fox and Kois, who was also present at the March 17th meeting, testified that Fox never made this statement. Pugh, however, testified that he had a tape recording of the March 17th meeting which would verify that Fox had made the statement. This court informed Pugh that if he had the tape recording, then he could offer it as evidence at his trial. Pugh, however, never produced the tape recording during or after the trial. This court found Fox's and Kois' testimony regarding Fox's alleged statement to be more credible than Pugh's. Thus, there was no evidence to suggest that Pugh was discharged because of his race.

This court notes that it is well aware that proving that discrimination was a determining factor in an employment decision is extremely difficult because employers rarely, if ever, state that race, sex, or age is a motivating factor when they discharge someone. There is no doubt, however, that these factors still enter into employment decisions. In the present case, however, the testimony of Fox and Kois was ex-

tremely convincing as to the reason why Pugh was discharged. Both witnesses were very forthcoming as to the circumstances surrounding Pugh's employment and discharge, and even admitted that some mistakes may have been made.

In fact, the evidence suggests that Pugh may have never falsified timesheets. This court found Pugh's testimony regarding the entire issue of whether or not he falsified the timesheets to be credible, and believes that he did not do so. This court, however, is convinced that both Fox and Kois believed at the time Pugh was discharged that he had falsified timesheets and that this was their reason for discharging him. Pugh's complaint and the trial were not based on the issue of whether or not Pugh falsified timesheets, but instead on the issue of whether or not he was discharged because he is an African–American. Thus, although this court finds that the DNR's discharge of Pugh may have been based on incorrect beliefs, it finds that Pugh's race was not a factor in his discharge.

IT IS THEREFORE ORDERED that defendants Richard Fox, Evelyn Kois, Dick Pomo, Dorothy Rymer, and Candace Richards' motion for summary judgment on plaintiff Carlton Pugh's § 1983 claim against them is GRANTED and Pugh's § 1983 claim is DISMISSED with prejudice.

IT IS FURTHER ORDERED that defendant State of Wisconsin Department of Natural Resource's motion for summary judgment on plaintiff Carlton Pugh's Title VII claim is DENIED.

IT IS FURTHER ORDERED that judgment on plaintiff Carlton Pugh's Title VII claim is entered for defendant State of Wisconsin Department of Natural Resources and Pugh's Title VII claim is DISMISSED with prejudice.