56 F.3d 67
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 Felicia GULLEY, Plaintiff-Appellant,
v.
ROCKFORD MEMORIAL HOSPITAL, Defendant-Appellee.
 No. 94-3382.
 United States Court of Appeals, Seventh Circuit.
 Argued April 25, 1995.
Decided May 19, 1995.
 
 Before FLAUM, RIPPLE and KANNE, Circuit Judges.
 
 ORDER
 
 1
 Felicia Gulley, a medical transcriptionist for the Rockford Memorial Hospital, filed an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e, et seq. and 42 U.S.C. Sec. 1981 against the hospital, alleging that she was terminated because she is black. The district court granted summary judgment in favor of the hospital, Fed. R. Civ. P. 56, finding that Gulley has failed to establish a prima facie case of race discrimination. Gulley appeals.
 
 I. Background
 
 2
 In 1992 Gulley was hired by the Rockford Memorial Hospital as a transcription secretary. In accordance with the hospital's policy, the first ninety days of Gulley's employment was a probationary period. Gulley was scheduled, at her request, to work the third shift, which was from 10 p.m. to 6 a.m., though the hospital allegedly had never scheduled full-time transcriptionists during that shift due to computer downtime from 12:15 a.m. to 1:30 a.m. each night. According to Patricia Holm, who interviewed and hired Gulley, the hospital created the position to accommodate Gulley because it was in need of transcriptionists and Gulley is a skilled transcriptionist with four to five years of experience. Holm instructed Gulley to assist the third-shift file clerk with sorting and routing transcribed reports and to take her meal breaks during computer downtime. Holm later repeated the same instruction to Gulley because of the file clerk's complaints that Gulley refused to help sort and distribute transcribed reports and that Gulley took breaks at the end of her shift, leaving early. Gulley remained the only full-time transcriptionist at the third shift during most of her employment with the hospital.
 
 
 3
 Approximately six weeks before the end of Gulley's ninety-day probationary period, Candice Blair became Gulley's supervisor. Blair had previously trained Gulley during orientation. She testified that she considered Gulley to be a very fast typist capable of transcribing 150 lines per hour. Gulley, however, was transcribing at 100 lines per hour, which was the minimum required. According to Blair, she had serious concerns about Gulley becoming a permanent employee because of Gulley's low transcription rate, poor attendance and erratic schedule. By the end of the ninety days, Gulley had taken five sick days even though she was not entitled to any and had changed her work schedule on at least fifteen occasions, sometimes on short notice and all for personal reasons. In a meeting held sometime around the end of Gulley's probation, Gulley indicated to Blair her understanding that it was okay to change the schedule. She also explained that her absences were justified due to a medical condition that the prior supervisor, Holm, was aware of when hiring her, and that she had made up one of the five sick days. Although the issue of Gulley's transcription rate was brought up during the meeting, the parties gave different interpretations; Blair stated that it was a negative evaluation while Gulley testified that she understood it to be a positive comment because she had been meeting the minimum.
 
 
 4
 Gulley did not become a regular employee at the end of the ninety days. Instead, Blair extended the probation for another sixty days. According to Blair, she wanted more time to assess Gulley's performance. Blair attended three additional training sessions with Gulley during which she instructed Gulley not to waste time trying to resolve problem reports but to leave them for her. She also initiated a time study of Gulley's activities to ascertain, according to Blair, whether conditions unique to the third shift were impeding Gulley's productivity. Blair testified that in her opinion, the time study showed that Gulley had poor time management and productivity, and failed to account for various delays despite Blair's instruction to keep detailed logs of all of her activities. Blair stated her belief that Gulley continued to waste substantial amount of time on problem reports, to take breaks at the end of the shift rather than during computer downtime, and to transcribe at the minimum rate of 100 lines per hour. Blair stated, however, that ten days before she terminated Gulley, she told Gulley that her error rate was excellent and her transcription was very fluid.
 
 
 5
 According to Blair, there were other complaints about Gulley: the file clerk continued to complain about Gulley's refusal to assist with sorting and routing transcribed reports during computer downtime; a transcriptionist complained that Gulley was transcribing physician reports out of order, skipping difficult reports and/or picking easy reports based upon the particular physician dictating the report. Additionally, an outside transcription service used by the hospital complained that Gulley had told them that the hospital was going to terminate their service. It is uncontested that such information was confidential, and that Gulley did not have authorization to reveal the information.
 
 
 6
 Blair discharged Gulley at the end of the extended probationary period and hired a white transcriptionist to replace Gulley. After Gulley's termination, the computer downtime during the third shift was eliminated and two white employees who worked during the third shift were allowed to use their judgment as to when to take breaks.
 
 II. Analysis
 
 7
 We review a grant of summary judgment de novo, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), viewing the record and the inferences drawn from it in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). We will affirm if there is no genuine issue of material fact such that judgment is proper as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Because Gulley did not deny or otherwise properly controvert the hospital's factual assertions, we will deem as admitted all factual assertions in the hospital's statement of facts submitted under the local rule. See Stewart v. McGinnis, 5 F.3d 1031, 1034-35 (7th Cir. 1993).
 
 
 8
 To show race discrimination under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the employee must first establish a prima facie case of discrimination to create a rebuttable presumption of discrimination. See Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1122 (7th Cir. 1994). The burden then shifts to the employer to articulate legitimate, nondiscriminatory reasons for the challenged employment action. Id. If the employer is successful, the presumption dissolves, and the burden of production shifts back to the employee, who must prove that race was the determining factor behind the employer's action. Id.; see also Saint Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742 (1993); Courtney v. Biosound, Inc., 42 F.3d 414, 424 n.4 (7th Cir. 1994).
 
 
 9
 To establish a prima facie case for race discrimination, Gulley must show that (1) she is a member of a protected class; (2) she was meeting her employer's legitimate job expectations; (3) despite meeting those expectations she was discharged; and (4) her employer sought a replacement. Hong v. Children's Memorial Hosp., 993 F.2d 1257, 1261 (7th Cir. 1993), cert. denied, 114 S. Ct. 1372 (1994); Kizer v. Children's Learning Center, 962 F.2d 608, 612 (7th Cir. 1992); Villa v. City of Chicago, 924 F.2d 629, 631 (7th Cir. 1991). The district court found that Gulley did not establish prong (2) of the prima facie case. In the alternative, the court also found that Gulley did not rebut the hospital's nondiscriminatory reason of deficient performance. Because the question of whether Gulley's job performance was satisfactory is intertwined with the issue of whether the hospital's reason for terminating Gully is pretextual, a separate analysis is necessary. See Anderson, 13 F.3d at 1124 n.4.
 
 
 10
 Gulley has failed to show that she was meeting her employer's legitimate expectations at the time of her termination. Blair, as Gulley's supervisor, stated her belief that Gulley was not dependable, failed to follow instructions, could not be trusted to remain productive, required constant supervision, had poor judgment, and managed her time poorly. More importantly, Blair believed that Gulley was not working to her full productive capacity. Blair, who had previously trained Gulley, considered Gulley to be very computer literate, knowledgeable of terminology and a very fast typist. She estimated, by checking the transcription software and the dictaphone against Gulley's time logs, that Gulley could transcribe at a much higher rate than what Gulley had been performing, the minimum rate of 100 lines per hour. In fact, Gulley, who was compensated as a skilled transcriptionist with four to five years of experience, admitted that she may have been able to produce more, but paced herself because she did not want to "burn out" toward the end of her shift.[1] She also admitted that she did not feel pressured to get things done after she met the 100 lines per hour rate.[2]
 
 
 11
 Gulley argues that she "was able to perform the essential functions of the job," contending that she had no performance problem while under the supervision of Holm and that Blair herself had indicated that Gulley transcription was fluid with low error rate. We have said that general averments of adequate performance are insufficient to create a factual issue on summary judgment even when corroborated by statements of supervisors or coworkers. To create an issue of fact, the employee must specifically refute facts that allegedly underlie the employer's negative performance assessment. See Dey v. Colt Construction & Development Co., 28 F.3d 1446, 1460 (7th Cir. 1994); see also Komel v. Jewel Cos., 874 F.2d 472, 474-75 (7th Cir. 1989) ("an employee's denial of specific events which form the basis of the employer's evaluation may be sufficient to create a genuine issue of fact."). Gulley does not attempt to show why Blair could not legitimately expect her to produce more than 100 lines per hour or how the delays exhibited in the time logs should be interpreted. She merely contests, without elaboration, that Blair was not qualified to evaluate her work performance and inappropriately applied subjective rather than objective criteria to evaluate her performance. Moreover, Gulley does not contest that she failed to follow Blair's instructions to assist with sorting and routing transcribed reports and to take her meal break during computer downtime. Nor does she deny that she had communicated, without authorization, to an outside transcription service the hospital's intention to terminate its service.
 
 
 12
 Instead of refuting the specific claims of unsatisfactory performance, Gulley simply attributed Blair's criticism to racial animus. She contends that she was singled out by Blair for time study contrary to hospital practice, and that Blair's criticism of her lack of initiative was based on racial stereotypes. Gulley also claimed, with much emphasis, that the hospital had never before hired a black transcriptionist. Gulley may have felt that it was unfair for Blair to subject her to a time study when the hospital's prior time studies had been for all transcriptionists. Yet, Gulley's situation was unique. She was the only full-time transcriptionist working at the third shift during most of her employment, and was the only employee on probation whose status, coupled with the employer's concern about her performance, could legitimately justify close monitoring to determine whether permanent employment should be extended. More importantly, Blair explained that she conducted the time study to ascertain whether factors unique to the third shift, but unknown to her, may have accounted for Gulley's low productivity. Gulley has alleged no facts that would cast doubt on the Blair's explanation. This court therefore will not sit as a super-personnel department to second guess the employer's personnel assessment. Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359 (7th Cir. 1988); see also Lindsey v. Baxter Healthcare Corp., 962 F.2d 586, 588 (7th Cir. 1992) ("[t]he fact that the [employment] decision may have reflected a philosophy of personnel management with which the plaintiff's lawyer disagrees cuts no ice at all"), cert. denied, 113 S. Ct. 442 (1992).
 
 
 13
 Gulley's reliance on the former supervisor Holm's positive evaluation -- that Gulley's productivity was increasing with each pay period and that she was performing what was expected of a new transcriptionist -- does not refute Blair's negative performance assessment. As the district court correctly observed, the employee must demonstrate that she was meeting the employer's legitimate expectations at the time of termination. Hong, 993 F.2d at 1262; Karazanos v. Navistar Intl. Transp. Corp., 948 F.2d 332, 336 (7th Cir. 1991). The fact that Gulley was meeting the standard for a new transcriptionist in the first sixty days of her employment does not discount Blair's assessment that in ninety days that followed, Gulley ultimately did not perform up to what was expected of her as a regular employee. Cf. Grohs v. Gold Bond Building Products, 859 F.2d 1283, 1287 (7th Cir. 1988) ("The fact that an individual may have been qualified in the past does not mean that he is qualified at a later time."), cert. denied, 490 U.S. 1036 (1989).
 
 
 14
 Admittedly, unlike the poor attendance and erratic schedule Gulley exhibited in the first ninety days, Gulley had only one approved absence and no unapproved absences during the extended probationary period. This may undermine somewhat Blair's claim that Gulley was unreliable and not dependable. On the other hand, Gulley does not dispute Blair's claim that she continued to take her meal break at the end of the shift and leave early. Given that an employer's assessment of an employee's dependability may encompass many factors, Blair could conclude, from Gulley's prior problems of absenteeism, erratic schedule and unexplained delays on the time log, that Gulley would not be a reliable and dependable employee when offered the permanent position. This conclusion has credence especially in light of Blair's uncontested testimony that a transcriptionist's dependability is particularly important because the medical records department is required to have dictated reports transcribed, sorted, and routed within a certain number of hours.
 
 
 15
 The uncontradicted evidence establishes that Gulley did not live up to her employer's legitimate expectations; Gulley either admitted the employer's specific criticisms of her performance or simply attributed the criticisms to racial animus without any detailed refutation of the allegations that underlie the employer's negative assessment. Cf. Shager v. Upjohn Co., 913 F.2d 398, 400-01 (7th Cir. 1990) (plaintiff discharged for allegedly deficient performance survives summary judgment by showing that performance deficiencies were greatly exaggerated and that any deficiencies were offset by superior sales figures). Because Gulley has failed to meet her threshold burden of establishing a prima facie case, the district court properly granted summary judgment in favor of the defendant employer.
 
 
 16
 AFFIRMED.
 
 
 
 [1]
 Gulley testified that she had informed Blair: "I told her, 'I do pace myself because I don't want to burn out towards the end of my shift. I want to be able to keep going strong until I get done. A transcriptionist's most productive time is the first six hours of her shift."' Plaintiff's Deposition at 145
 
 
 [2]
 Gulley stated during deposition, "My goal was always to meet the minimum, and then after that I was a little bit easier. I didn't feel so pressured.... I don't think I would call it slacking off, but there wasn't the pressure or the tension to get things done as much as there is until you meet your quota." Plaintiff's Deposition at 167