**Paul ISENBERGH, Plaintiff,**

v.

**KNIGHT–RIDDER NEWSPAPER SALES, INC., n/k/a Newspapers First, Inc. and Knight–Ridder, Inc., Defendants.**

**No. 91–1596–Civ.**

United States District Court, S.D. Florida, Miami Division.

June 22, 1994.

Amlong & Amlong by William Robert Amlong, Fort Lauderdale, FL, for plaintiff.

Alley & Alley by John Edward Alley and Robert D. Hall, Jr., Wicker, Smith, Tutan, O'Hara, McCoy, Graham & Lane, P.A. by William Stuart Reese, Miami, FL, for defendants.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, District Judge.

Defendants move this court for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) based on (1) the plaintiff's failure to establish a *prima facie* case; and (2) insufficient evidence of a violation of the A.D.E.A. including a lack of evidence of pretext. For the foregoing reasons the motion for judgment notwithstanding the verdict is GRANTED.[1]

### Background

This litigation was born of the 1992 merger of Knight–Ridder Newspaper Sales (KRNS) and Million Market Newspapers/Times Mirror National Marketing, Inc. (MMTM), which resulted in the emergence of a new entity known as Newspapers First, Inc. ("Newspapers First"). The merger's resulting reduction in force pitted Paul Isenbergh, 60, against Larry Malloy, 44, as contenders for the position of Manager of the Miami office of Newspapers First. Isenbergh had been the manager of the Miami office of KRNS for a number of years, and had worked for KRNS since the late sixties, when it took over the Philadelphia Inquirer, Isenbergh's previous employer. Malloy had worked in the newspaper advertising business for several years prior to his employment with MMTM as manager of the Miami branch office, which employment spanned approximately eight years prior to the merger of KRNS and MMTM. Following Malloy's appointment as manager, Isenbergh instituted this suit alleging violations of the Age Discrimination in Employment Act, ("A.D.E.A."), 29 U.S.C. § 621 *et seq.*

On June 3, 1992 this court (Ryskamp, J.) issued an order granting partial summary judgment for defendants on Isenbergh's claim that he had been constructively discharged. A subsequent order was entered on May 21, 1993 (Ungaro–Benages, J.) in response to a defense motion urging that all recovery under the A.D.E.A. was precluded in the absence of a constructive discharge. The order denied summary judgment on the grounds submitted, leaving for trial the failure to hire theory, i.e., plaintiff was free to prove at trial that Newspapers First's failure to hire Isenbergh for the managerial position in Miami constituted a violation of the A.D.E.A.[2]

The case was tried before a jury from March 4, 1994 to March 10, 1994. A verdict was returned on March 10 in favor of the plaintiff which awarded $250,000 in damages to compensate the loss Isenbergh suffered as a result of Malloy's being hired instead of him. A supplemental verdict form was given to the jury inquiring as to whether the jury believed Newspapers First had a good faith belief that Malloy was more qualified for the position of manager than was Isenbergh. The jury responded in the negative. The defendants now move this court for judgment as a matter of law which we presently grant.

### Discussion

### I. THE RULE 50(b) STANDARD

The standard to be utilized in setting aside a verdict and granting judgment as a matter of law has been enunciated by the Eleventh Circuit on numerous occasions. *E.g., Lamb*

---

1. Defendants moved for a directed verdict at the time the plaintiff rested (Tr. 219) and again at the end of the entire case (Tr. 394), thereby satisfying the requirement set forth in *Redd v. City of Phenix City, Ala.,* 934 F.2d 1211, 1214 (11th Cir. 1991) that a motion for directed verdict be made at the close of all the evidence in order to preserve the right to judgment notwithstanding the verdict.

2. After colloquy occurred on March 7, 1994 between the attorneys and the court concerning the effect of the prior orders, the court's intention to treat the remainder of the case as a failure to hire case was made clear. Plaintiff's complaint was amended to explicitly allege the failure to hire theory, and the jury was charged solely on the failure to hire theory.

by *Shepard v. Sears, Roebuck & Co.*, 1 F.3d 1184, 1187 (11th Cir.1993); *Miles v. Tennessee River Pulp and Paper Co.*, 862 F.2d 1525, 1528 (11th Cir.1989). This circuit's standard was initially set out by the Fifth Circuit, prior to the creation of the Eleventh Circuit,[3] when that court decided the often cited *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969). In *Boeing* the Fifth Circuit said the following:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied.... *A mere scintilla of evidence is insufficient to present a question for the jury.* The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, *nor should they be granted only when there is a complete absence of probative facts to support a jury verdict.* There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Id.* at 374–375 (emphasis added).

■ There is no doubt that all inferences must be drawn in the light most favorable to the non-movant for the purposes of decid-

ing the motion. *Bauer Lamp Co., Inc. v. Shaffer*, 941 F.2d 1165, 1169 (11th Cir.1991); *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989). However, there is also no doubt left in this circuit that "motions for ... judgment notwithstanding the verdict need not be reserved for situations where there is a complete absence of facts to support a jury verdict. Rather there must be a substantial conflict in evidence to support a jury question." *Id.* "It bears repeating that a mere scintilla of evidence does not create a jury question." *Id.* Accord, *Neely v. Delta Brick & Tile Co., Inc.*, 817 F.2d 1224, 1225 (5th Cir.1987) ("The *en banc* decision in Boeing overruled *Planters* in our circuit, and the scintilla rule is not our rule.")

## II. THE LAW OF AGE DISCRIMINATION

■ When suing under the A.D.E.A. a plaintiff may take one of three avenues to prove his case. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077 (11th Cir.1990). He can attempt to demonstrate discrimination by direct evidence, by statistical proof, or by establishing the elements of a *prima facie* case through circumstantial evidence as discussed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This case involves only the third method of proof. The plaintiff presented no statistical evidence at trial and stipulated prior to trial that he had no direct evidence[4] that the defendant's decisions were motivated by age factors. (Order of Ryskamp, J. of June 3, 1992, at 7).

■ The elements of a *prima facie* case as set forth in *McDonnell Douglas* are (1) that the plaintiff is a member of the protected class; (2) that the plaintiff applied for and was qualified for a job for which the employer was seeking applicants; (3) that despite his qualifications the plaintiff was rejected; and (4) that after his rejection the position

---

**3.** The decisions of the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to close of business on that date, are binding as precedent on all federal courts within the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir.1981).

**4.** "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact [in issue] *without inference or presumption*." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990) (citing *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir.1989)) (emphasis added by *Earley*).

remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824. The Eleventh Circuit has utilized this standard in determining the existence of a *prima facie* case in the failure to hire context. *Welborn v. Reynolds Metals Co.*, 810 F.2d 1026 (11th Cir.1987).[5]

Useful as it may be, the *McDonnell Douglas* formulation is "not the alpha and omega of possible tests in the age discrimination context." *Pace v. Southern Ry. System*, 701 F.2d 1383, 1387 (11th Cir.1983) (citing *McCorstin v. United States Steel*, 621 F.2d 749, 753 (5th Cir.1980)), *cert. denied*, 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983). The Supreme Court has pointed out that since the facts vary from one discrimination case to another, the *McDonnell Douglas* framework does not necessarily apply to all cases. *McDonnell Douglas*, 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13. In recognition of this, several variations of the *McDonnell Douglas* test have been adopted by the Eleventh Circuit.[6]

One such variation requires the plaintiff to demonstrate "(1) he was in a protected age group and was adversely affected by an employment decision, (2) that he was qualified for his current position or to assume another position at the time of discharge or demotion, and (3) evidence by which a fact finder might reasonably conclude that the employer intended to discriminate on the basis of age in reaching the decision at issue." *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir.1991) (discharged employee alleging age discrimination where there was no reduction in work force occurring); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077 (11th Cir.1990) (same standard as set forth in *Alphin* utilized in the reduction in force context). The requirements for a *prima facie* case of discrimination in this circuit were set forth a little differently in *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir.1989)[7] where the Eleventh Circuit stated:

> This Circuit has adopted a variation of the four-pronged test set out for Title VII claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), that allows a plaintiff to establish a *prima facie* case under the ADEA with circumstantial evidence by proving: (1) that he is a member of the protected group; (2) that adverse employment action was taken against him, e.g. discharge, demotion, or failure to hire; (3) that he was replaced by a person outside the protected group; and (4) that he was qualified for the position for which he was rejected. (Citations omitted, emphasis added).[8]

In utilizing this standard, the Eleventh Circuit has held that the requirement that

---

**5.** While the Eleventh Circuit has not done so, some courts have made modifications to the *McDonnell Douglas* test to accommodate the plaintiff who asserts a failure to hire theory of discrimination. For example, in *Autry v. North Carolina Dep't of Human Resources*, 820 F.2d 1384 (4th Cir.1987), the Fourth Circuit reasoned that it is by definition impossible to satisfy the fourth prong of *McDonnell Douglas* in a failure to hire context. Where an individual is refused a job for discriminatory reasons and the job is subsequently filled by a person who is not a member of the protected class, the position does not remain open and the employer does not continue to seek applicants from persons of the rejected party's qualifications. *Autry*, 820 F.2d at 1386. Thus, a modified version of *McDonnell Douglas* which does not require satisfaction of the fourth prong was adopted by the Fourth Circuit for failure to hire cases. The modification is not designed to give plaintiffs a free ride, however, and is not without admonition. The plaintiff must show a connection between the discrimination and the protected characteristic.

"In other words, [the plaintiff] would have to show that [he] was not promoted because of [his age], not that [he] was a member of [the protected class] and not promoted." *Autry*, 820 F.2d at 1386.

**6.** Like the Supreme Court, the Eleventh Circuit has also acknowledged the need for flexibility in discrimination cases. "In this Circuit we have 'repeated[ly] eschew[ed] ... an overly strict formulation of the elements of a prima facie case, especially in age discrimination cases.'" *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir.1991).

**7.** This case involved neither failure to hire nor reduction in force.

**8.** This standard is identical to the one set forth in *Cuddy v. Carmen*, 762 F.2d 119 (D.C.Cir.), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 597, 88 L.Ed.2d 576 (1985), which was cited in the briefs of both parties.

the plaintiff be overlooked in favor of an individual who is not a member of the protected class is flexible in an age discrimination case because the protected class is part of a continuum rather than an entity that exists as a discrete group. *Id.* at 583. In a case brought pursuant to the A.D.E.A., the plaintiff may satisfy the requirement that he was rejected in favor of one not in the protected class by "showing that a plaintiff 'was replaced by a *substantially* younger employee with equal or inferior qualifications' (emphasis in original)." *Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550, 1559 (11th Cir. 1988).[9]

■ We do not attempt to adopt one formulation of the *prima facie* case standard over another as definitive in deciding this case. "The particularly amorphous nature of age discrimination counsels against rigid application of a [specific] test." *Pace v. Southern Ry. System,* 701 F.2d at 1387. This, however, does not leave us without a standard by which to determine the substance of the defendant's motion. Our determination will "turn[ ] on whether the plaintiff has presented sufficient evidence to provide a basis for an inference that age was a factor in the employment decision." *Id.* (citing *Simmons v. McGuffey Nursing Home, Inc.,* 619 F.2d 369, 370 (5th Cir.1980)); *Marshall v. Goodyear Tire & Rubber Co.,* 554 F.2d 730, 735 (5th Cir.1977). This is consistent with the teaching of the Supreme Court in *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) as well as being in line with Eleventh Circuit precedent.

■ Typically, after it is established that the plaintiff has demonstrated a *prima facie* case, a presumption of discrimination arises, and the burden of production shifts to the defendant to offer a legitimate, non-discriminatory motive for the action it took in denying employment to the plaintiff. *McDonnell Douglas Corp. v. Green,* 411 U.S.

792, 802–803, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). This burden is one of production, not of persuasion. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Brown v. American Honda Motor Co.,* 939 F.2d 946, 949 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). "The purpose of placing this burden on the defendant is 'simultaneously to meet the plaintiff's *prima facie* case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.'" *Cuddy v. Carmen,* 762 F.2d 119, 123 (D.C.Cir.), *cert. denied,* 474 U.S. 1034, 106 S.Ct. 597, 88 L.Ed.2d 576 (1985) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255–256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). Once the defendant has proffered a legitimate, non-discriminatory motive for its actions, the burden of production then shifts back to the plaintiff to demonstrate that the reason offered by the defendant was pretextual. *Carter,* 870 F.2d at 584. "The Supreme Court teaches that 'a reason cannot be proved to be a "pretext *for discrimination*" unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Gallo v. Prudential Residential Services, Limited Partnership,* 22 F.3d 1219, 1225 (2d Cir.1994) (citing *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993)) (emphasis in *Hicks* ).

■ The Supreme Court has made absolutely clear that the burden of proof in an age discrimination case is at all times on the plaintiff to demonstrate that he was the victim of intentional discrimination based on his age. *Hicks,* —— U.S. —— at ——, 113 S.Ct. 2742 at 2747 (1993). The plaintiff's burden goes beyond merely establishing that the reasons offered by the defendant for its ac-

---

9. "The conclusion that replacement by a younger person will support a prima facie case was founded in part on a Department of Labor (DOL) interpretive rule in which the DOL concludes that replacement of a protected employee by one also within the protected group does not pre-

clude a finding of a prima facie case of discrimination." *Pace v. Southern Ry. System,* 701 F.2d 1383, 1389 (11th Cir.1983) (citing 49 C.F.R. § 860.91), *cert. denied,* 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983).

tion were not worthy of belief. More than this, the plaintiff must affirmatively prove by a preponderance of the evidence that discrimination did in fact occur. *Id.* at ——, 113 S.Ct. at 2751.

■ If the defendant offers a legitimate non-discriminatory motive for the action it took, the presumption of discrimination that arose from the plaintiff's *prima facie* case drops out and "the trier of fact must determine whether the plaintiff has met the ultimate burden of showing the employer intentionally discriminated against him in violation of the ADEA." *Krieg v. Paul Revere Life Ins. Co.,* 718 F.2d 998, 999 (11th Cir. 1983), *cert. denied,* 466 U.S. 929, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984) (affirming the District Court's grant of judgment notwithstanding the verdict for failure to demonstrate pretext). In the absence of a presumption of discrimination, the question left to this court in determining defendant's Rule 50 motion is "whether the plaintiff's proof constituted evidence substantial enough to raise an inference of discrimination." *Id.* at 1001. In order for the jury's verdict to stand, the evidence must demonstrate that it was probable that Newspapers First acted pursuant to discriminatory motives; a mere possibility will not suffice. *Autry v. North Carolina Dep't of Human Resources,* 820 F.2d 1384 (4th Cir.1987). "[T]he factfinder must not be permitted to engage in surmise and conjecture," *id.,* and the purpose of Rule 50 is to ensure that it does not.

We find that in this case the jury did indeed engage in surmise and conjecture when it found that Newspapers First discriminated against Isenbergh on the basis of his age. After reviewing the evidence presented at trial, we conclude that not only did the plaintiff fail to carry its burden of proving discrimination under *Hicks,* he also failed to meet the lower hurdle of demonstrating defendant's offered reasons for the decision to hire Malloy were not credible.

### III. THE EVIDENCE ADDUCED AT TRIAL

#### The Qualifications of Isenbergh and Malloy

Paul Isenbergh worked for KRNS from the time it took over the Philadelphia Inquirer in 1968 or 1969. (T. 54). He had opened the Miami office for the Philadelphia Inquirer after being promoted from his previous position in New York. (T. 54). Isenbergh was made a vice president of KRNS in 1984. (T. 55).

In 1986, prior to the merger between KRNS and MMTM, Isenbergh had the opportunity to become familiar with Larry Malloy while competing for Walt Disney World business in Detroit, (T. 57), a competition which Isenbergh won. (T. 60–61). There was evidence that one of the most significant factors motivating Disney to go with Isenbergh's paper over Malloy's was the cheaper rate Isenbergh was able to offer on behalf of his client. (T. 295). Regardless of how the Disney account was won, Isenbergh received the praise of his superiors at KRNS, (T. 60–62, 66), as well as recognition from the Detroit Free Press, the paper for which the advertisements were sold. (T. 64).

The office Isenbergh managed in Miami consisted of himself, a salesman by the name of Robert Govin, and one secretary. (T. 81). The office had consisted at one time of five people, but had decreased in size during the seventies and eighties. (T. 81). Isenbergh's duties included the servicing of certain accounts in a sales capacity as well as preparing monthly reports and memoranda. (T. 74). Beyond participating in occasional conference calls and preparing the monthly reports, with which he was assisted by both Govin and the secretary, Isenbergh's duties were principally sales related. (T. 292). Isenbergh received a raise every year for thirty-three years. (T. 66).

Larry Malloy, Paul Isenbergh's competitor for the managerial position, had started working for Million Markets in 1982 prior to its merger with Times Mirror. (T. 94). Prior to that he had worked as the national advertising manager of the Philadelphia Bulletin where he managed a staff of thirty-four sales people and seven clerical workers. (T. 106). In 1982 he went to Florida to open a branch office for Million Market Newspapers as their sole representative in that office.

(T. 110) In 1983 he hired a sales representative to work for him (T. 111), and in 1985 when Million Market merged with Times Mirror, an additional sales person was added to the Miami office. Paul Isenbergh, the plaintiff in this action, had recommended Larry Malloy take over as President of the Newspaper Advertising Sales Association when he stepped down from that post. (T. 82, 126).

### The Interviews

In 1992 it became apparent that KRNS and MMTM were going to merge. The managers were told that they had to go to New York to interview for their positions. (T. 56, 123). Both Paul Isenbergh and Larry Malloy were interviewed by John Kosanke, the former president of KRNS and the executive vice president of Newspapers First and also by Kingsley Anthony, the president of Newspapers First who had come from the MMTM side before the merger. (T. 56, 123).

Viewing the evidence in the light most favorable to Isenbergh, his interview lasted only thirty minutes and the atmosphere was cold. (T. 70). Anthony spoke on the telephone for some time during the interview, and Kosanke asked most of the questions. (T. 70). One point Kosanke and Anthony discussed at Isenbergh's interview was the faster pace Newspapers First would be working at than what Isenbergh was used to at KRNS. (T. 71). Before KRNS and MMTM merged, KRNS represented twenty-eight newspapers nationwide and MMTM represented twelve. (T. 71). MMTM was responsible for eleven major market newspapers (T. 296) and KRNS handled six major papers (T. 295).

Isenbergh felt he had come across as enthusiastic at the interview. (T. 71). He discussed what the new company would do and incentives that could be developed for increasing business. (T. 71). He also discussed increased sales incentives for managers, a topic not raised by any other interviewee. (T. 349). Isenbergh also raised issues relating to the creditworthiness of certain advertisers. (T. 349).

There was uncontradicted testimony that Isenbergh returned from the interview with positive feelings. Bob Govin, a personal friend of Isenbergh, testified that Isenbergh was "quite upbeat about it and felt that the interview went quite well in New York." (T. 299). He never told Govin that he felt he had been treated unfairly because of his age. (T. 300). Govin testified that prior to the merger between KRNS and MMTM both Isenbergh and Malloy enjoyed fine reputations. (T. 299–300). Kosanke testified, however, that Isenbergh exhibited "no real excitement—nothing really to sell himself that he was the person to be the Miami manager." (T. 349). Anthony shared Kosanke's views on Isenbergh's lack of enthusiasm. (T. 249–253).

After interviewing Malloy, both Anthony and Kosanke were impressed by Malloy's managerial experience as well as his sales experience. (T. 346). They observed that Malloy was excited about the new opportunities the merger would present, sitting at the edge of the sofa throughout the interview. (T. 346). Kosanke recalled Malloy telling him that his general philosophy was "to sell the most each day." (T. 346). Malloy made it clear both that he wanted the job and that he was well qualified for it. (T. 248).

### The Selection Process

Since Anthony did not know any of the KRNS people and Kosanke did not know any of the MMTM people prior to the interviews, Kosanke ranked his managers and Anthony ranked his on the basis of relative managerial skills in anticipation of the interview process. (T. 237). When Kosanke evaluated the seven managers (T. 322) of the various regions throughout the country relative to one another's managerial skills, Kosanke ranked Isenbergh next to last. (T. 331). At least one manager over the age of sixty, Mr. Watkins, was ranked higher than Isenbergh. (T. 335). Anthony's ranking of the three MMTM managers established the oldest of the three managers at MMTM as the best, and the youngest as the worst. (T. 238). At the time these rankings were tabulated, Kosanke was just shy of his sixtieth birthday, (T. 335), Anthony was fifty-five (T. 188) and the plaintiff was sixty years of age. (T. 57).

One of the reasons offered by Kosanke for ranking Isenbergh second to last was that he

did not perceive Isenbergh to be a team player. (T. 331). Kosanke offered the discussions of the lease on the Miami office as an example. (T. 332). When the lease expired on the office some time in 1988, Kosanke did not want to commit to any particular office space because he knew a merger with MMTM was possible and he was not yet familiar with what the needs of the new Miami division would be. (T. 332). He suggested that Isenbergh contact the landlord and work out an extension, which Isenbergh did for a period of approximately four or five months. (T. 332). However, Isenbergh eventually told Kosanke that he had been advised by the landlord that they had thirty days to vacate the premises because the landlord had found a new tenant. (T. 332). When Kosanke contacted the landlord directly, he was advised that there was no new tenant, and KRNS could stay on until a new tenant was found. (T. 334).

Kosanke also encountered difficulty in dealing with Isenbergh regarding the Miami office's budget. While the budget for Miami was always ultimately approved, "every year was a battle". (T. 315). Kosanke characterized Isenbergh as a "lone ranger" type of manager interested only in his piece of business rather than the overall whole of the company. (T. 317). Isenbergh received credit toward his management by objective bonus for bringing his office in under budget, which he always did. (T. 316).

During his testimony, Kosanke also talked about the employee of the month program and the difficulties he had encountered with Isenbergh in relation to it. (T. 319). Kosanke did not want the program to create tension between the salesmen and the managers. In order to avoid allegations by a salesman that the manager did not push hard enough for him to win the award, Kosanke instituted a limitation on the recommendation a manager could make on behalf of a member of his staff. (T. 319). The manager was constrained to completing a form which contained only a line and a half for comment. (T. 320). While other managers limited themselves to the space provided, Isenbergh would usually send a one or two page note to Kosanke lobbying in favor of his salesman. (T. 320).

Like Isenbergh, Malloy too had been criticized by his superiors, only to a much lesser degree. Although Anthony classified the criticism as "not terribly significant," (T. 243) Malloy's difficulty with delegation was recorded in his personnel evaluations.

Following the interviews of all the managers, Kosanke and Anthony collectively created a ranking of the interviewees. (T. 237). An alternation ranking system was used, which means that the best candidate for a position is selected, then the worst. The person doing the evaluation then chooses the best and worst of the remaining candidates and the process continues until all of the candidates are placed in a rank. This ranking placed Malloy third or fourth and Isenbergh next to last. (T. 253). Anthony and Kosanke then discussed the rankings they had made of their own people, and combined the two parts to come up with a new ranking from most qualified to least qualified. (T. 237).

KRNS has never relied solely on an alternation ranking system before in making personnel decisions, however it had been used as an aid in making personnel decisions as well as in management development. (T. 160, 175). Alternation ranking was not used to make personnel decisions at Knight Ridder, Inc. between 1989 and the time of the merger of KRNS and MMTM. (T. 172). Decisions to move an employee up through the ranks at KRNS were made based on past performance. (T. 162). There is neither an official set of criteria nor a formalized objective program utilized to make decisions regarding an employee's advancement within the company. (T. 169–170).

One of the strengths of alternation ranking is that "if you [sic] identif[y] the dimension that you [sic] are rating people on, you [sic] can quickly sort out the highs and the lows . . . ." (T. 160). The dimensions being evaluated were set forth in a document entitled "Procedures for the Selection of Managers" which was prepared from notes taken by Robert Termotto, the C.F.O. of Newspapers First at a meeting in Baltimore. (T. 177). The document was drafted after Termotto

met with Kosanke, Anthony and Mary Jean Connors, Vice President of human resources for Knight Ridder, Inc., KRNS's parent company. (T. 179) The guidelines set forth in the document included the candidate's long term potential for advancement to a larger office responsibility and/or promotion to senior management as one of the criteria to be considered in selecting a manager. (Plaintiff's Trial Exhibit 57). Another factor to be considered was the "potential value of local territory understanding and experience." (Plaintiff's Trial Exhibit 57). Neither of these two areas were explored with Isenbergh during his interview with Anthony and Kosanke. (T. 261–262).

Prior to the meeting, Termotto had never used alternation ranking. (T. 181). The criteria eventually established by Mr. Termotto resulted at least in part from discussions with Kosanke and Anthony, (T. 182); however, Termotto does not recall exactly how he came up with the criteria he suggested. (T. 182). Termotto did not consult with anyone at MMTM, KRNS or Knight Ridder, Inc. regarding Equal Employment Opportunity issues during the process of formulating the selection criteria. (T. 184).

Anthony testified that the outline for selection was suggested by Mary Jean Connors, (T. 200); however, Connors testified that her department does not recommend alternation ranking as a general practice. (T. 172). Robert Termotto did not recall Connors making any specific contributions to the selection criteria. (T. 179). Although Termotto recalled discussing the selection criteria with Kosanke and Anthony, he did not recall discussing them with anyone else. (T. 182).

The Human Resources Office at Knight–Ridder, Inc. was aware that decisions regarding the managerial positions of Newspapers First would be filled at least partially in accordance with an alternation ranking system, since the ranking forms were obtained from that office. (T. 174). While it was the Human Resources Department that was re-

sponsible for monitoring compliance with equal employment opportunity requirements, no one from Knight Ridder's corporate human resources department participated in the evaluation of managers in any way following the merger of KRNS and MMTM. (T. 174).

### The Outcome

After interviewing Malloy, Isenbergh and the other managerial candidates, Malloy was selected for the manager's position in Miami. Isenbergh was offered an opportunity to interview for one of the sales positions in the Miami office, but he refused to do so, indicating that his doctors had advised him the situation was too stressful for him.[10] (T. 76, 129). Isenbergh ultimately decided to retire. (T. 83).

## IV. APPLYING THE FACTS TO THE LAW

The first question with which we are presented is whether Isenbergh established a *prima facie* case. The answer to this question is unnecessary to the disposition of this motion, because Isenbergh failed to prove that the reasons offered by Newspapers First for hiring Malloy over him were pretextual, and furthermore failed to demonstrate that he was the victim of discrimination based on his age. Nevertheless, we address the insufficiency of the *prima facie* case. In so doing, it is of little consequence which statement of the requirements for a *prima facie* case we select as the framework for our analysis, since Isenbergh failed to make out a *prima facie* case under any of the formulations utilized by this circuit.

■ Were we to utilize the *McDonnell Douglas* paradigm, Isenbergh's *prima facie* case would fail on the fourth prong. While it is clear that he is a member of the protected class, and that he was rejected for the managerial job, it is less clear that he was quali-

---

10. At this point we also take notice of the efforts made by plaintiff's counsel to speed this case to trial in light of the deteriorating health of the plaintiff. This lends additional support to the conclusion of this court that Isenbergh voluntarily chose to retire in light of his poor health and the limitations that resulted therefrom rather

fied for the position [11]; however, assuming that he was, once Isenbergh was rejected, the job no longer remained open and Newspapers First did not continue to seek applicants from a less qualified pool of candidates. Ultimately a candidate possessing more qualifications for the managerial position was selected. It was unchallenged at trial that Larry Malloy had experience running an office consisting of many more people than Isenbergh was accustomed to supervising. It was also unchallenged that both Larry Malloy and Paul Isenbergh enjoyed fine reputations in the advertising business. While Isenbergh testified that he felt he had come across as enthusiastic, both of his interviewers testified that they found Larry Malloy to be more so, citing specific examples of how they came to their conclusion. Isenbergh offered absolutely no evidence that after he was rejected for the position Newspapers First continued to seek applicants from a less qualified pool of applicants.[12]

If we adhered strictly to the formulation set out in *Alphin* and *Earley*, Isenbergh's *prima facie* case would fail because he did not present any evidence to satisfy the third prong, i.e., he produced no evidence by which a fact finder might reasonably conclude that the employer intended to discriminate on the basis of age in choosing Malloy over Isenbergh. Although he later complained of having received an unsatisfactory interview, the record contained undisputed evidence that immediately following Isenbergh's return from New York he felt the interview had gone well. There is also undisputed evidence that at least one person older than Isenbergh, Mr. Watkins, was ranked higher than him in consideration for the job. The evidence most favorable to Isenbergh's case was the confusion as to how the selection criteria were arrived at as well as what the source of the decision to use alternation ranking as an evaluative tool was. However even this is not sufficient to make the plaintiff's case. At best one could infer from the discrepancies in the testimony of the defendant's employees that Newspapers First was using the selection guidelines to hide an ulterior motive in choosing Malloy over Isenbergh. This is not sufficient to make out a *prima facie* age discrimination case. As the Eleventh Circuit has made clear, "the employer may [take negative employment action against] an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984). There was no evidence to support the inference that the criteria were a post hoc justification for age discrimination.

While "departures from well established guidelines are indicative of attempts to conceal a discriminatory motive through the use of ad hoc criteria which allow the defendant to cloak a discriminatory intent in ostensibly neutral rationales," *Brown v. American Honda Motor Co.*, 939 F.2d 946, 951 (11th Cir.1991), there was in-

---

than being terminated as the result of illegal discrimination.

11. Clearly Isenbergh was qualified for a position as a sales person. His qualifications as a manager were more dubious. Robert Govin testified that Isenbergh's managerial duties were limited to participating in occasional conference calls and generating a monthly report. It is questionable whether such experience at KRNS rendered him qualified to manage a regional office of Newspapers First that would be responsible for more than twice the number of major market newspapers than Isenbergh was used to dealing with at KRNS. Clearly enhanced managerial skills would be necessary, and it is not at all apparent that Isenbergh possessed skills sufficient to handle the new position. While evidence was offered to demonstrate Isenbergh's sales acumen, no evidence was offered which might vouch for his managerial skills. Thus, it is the conclusion of this court that Isenbergh failed to carry his burden of proving himself qualified for the position of manager of Newspapers First's Miami Office.

12. Even if we were to adopt the Fourth Circuit's modification of the fourth prong of *McDonnell Douglas* for failure to hire cases, *Autry v. North Carolina Department of Human Resources*, 820 F.2d 1384 (4th Cir.1987), Isenbergh would still not be able to make out a prima facie case. The modified fourth prong requires proof of a causal connection between the protected characteristic and the negative employment action taken. Isenbergh failed to prove that he was not selected for the job because of his age. Demonstrating that he was in the protected class and not selected is not enough to make out a prima facie case under *Autry*.

sufficient evidence presented to conclude that the defendant departed from well established guidelines when it chose to use alternation ranking or when it established the factors to consider in ranking the candidates. The evidence demonstrated that there was no well established guideline from which to depart. Formulating some sort of objective criteria against which to evaluate employees when none previously existed can hardly be said to be departing from established guidelines so as to mask discriminatory intent. Additionally, there was nothing in the memorandum prepared by Termotto that suggested the criteria in the memo were to be strictly adhered to in making the decisions. The guidelines were merely suggestions to assist Kosanke and Anthony in making intelligent decisions about MMTM's future management team. Likewise, the fact that alternation ranking system had not previously been utilized to any significant degree is not sufficient to give rise to an inference of discriminatory intent. While a departure from established procedures is to be viewed with suspicion, it does not automatically give rise to an inference of discrimination. *Id.* at 952.

Isenbergh also urges that a reasonable inference of discrimination might be drawn from the fact, if taken unrebutted, that his interview was shorter than the hour it was supposed to be and was conducted while Anthony participated in numerous telephone calls. Even if we accept as true that the atmosphere was cold and Anthony was distracted, the conclusion that this was because of age discrimination requires a leap of logic that no reasonable person could make. At best it demonstrates a personal disregard for Isenbergh. There was absolutely no proof offered of a causal relationship between Isenbergh's age and the indifference he experienced during his interview.

■ Plaintiff also suggests that the inclusion of potential for long term advancement among the criteria to be considered in hiring managers is age discriminatory. We are not the first court to conclude that factoring the potential for long term advancement into an employment decision does not render the selection process per se discriminatory. In

*Priest v. Daimler–Benz*, 35 Empl.Prac.Dec. ¶ 34,181 (N.D.Ala. January 9, 1984), 1984 W.L. 941, the court stated that the inclusion of such a factor in employment criteria does not "automatically raise the spectre of discrimination." *Id.* The *Priest* case was remarkably similar to the case at bar in many ways. It involved a plaintiff who had been a manager in a company which merged with another company, only to discover that as a result of the merger, there would be fewer managers in the new entity than there had been between the two merging companies. Just as in our case, the plaintiff was outranked by another employee and eventually sued alleging violations of the A.D.E.A. The court discussed whether the plaintiff had succeeded in making out a *prima facie* case of discrimination, spending considerable time on the prong requiring the production of evidence which provides a basis for an inference that age was a factor in the employment decision. The plaintiff offered evidence that he was referred to during the evaluation process as an "old pro". He also challenged the long term potential criteria. The court granted summary judgment to the defendant holding that no reasonable inference could be drawn which would support the plaintiff's contention that he had been the victim of age discrimination. Likewise, Isenbergh has presented no evidence from which the reasonable inference of discrimination may be drawn. As the *Priest* court concluded, "[i]n essence, plaintiff was not retained because he was not ranked as high as others during the evaluation process. He was listed as an alternate, but the first choice took the position. There is no evidence that the evaluation process was undertaken in bad faith or that age was a factor to be deliberately considered in the evaluation process."[13] *Id.*

■ Isenbergh also attempted to make much of the fact that during his interview he was not specifically questioned regarding his experience and understanding of local territory or his potential for long term advancement even though these were two of the factors to be considered in making the determination. It is inconsistent for plaintiff to

---

**13.** The failure of the plaintiff to demonstrate pre- text will be addressed shortly.

argue simultaneously that the criteria create an age bias and also that the failure to inquire along those lines is discriminatory. Nonetheless, we address his concerns. The mere fact that no specific question was addressed to long term potential or local expertise does not give rise to an inference of discrimination. No one suggested the guidelines prepared by Termotto were to be interpreted in a rigid or formalistic manner. The existence of the skills and abilities they were designed to decipher could be gleaned from questioning that was not directed specifically at any one criterion. If the plaintiff was attempting to demonstrate the type of variance from set procedure as discussed in *Brown v. American Honda Motor Co.*, *supra*, surely he did not succeed because the failure to inquire of the plaintiff verbatim from the guidelines can hardly be said to lead to a viable inference that discrimination occurred.

This failure by the plaintiff to offer evidence from which one could reasonably infer discrimination necessitates the defendant's motion be granted under *Pace v. Southern Ry. System*, 701 F.2d 1383 (11th Cir.), *cert. denied*, 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983) as well. Moreover, such a result is also mandated by the Supreme Court's holding in *Hicks*, since the plaintiff has failed to carry its burden of proof by neglecting to offer any evidence from which one could reasonably infer he was the victim of discrimination based upon his age.

■ If we were guided by the *prima facie* standard set forth in *Carter*, Isenbergh might be able to survive a motion directed at the failure of the *prima facie* case. The only element about which there would be a question would be his qualifications for the managerial position. As indicated above, even if it were determined that Isenbergh were qualified[14], and thus his *prima facie* case is achieved, the defendant's motion would be granted because Isenbergh clearly failed to demonstrate the defendant's offered reasons for hiring Malloy over Isenbergh were pretextual.

Newspapers First offered Isenbergh's low ranking as the reason for its decision to hire Malloy. Isenbergh challenges the entire alternation ranking system as a sham, but offers no evidence to support his allegations. Moreover, he allowed to go unchallenged the reasons offered by Newspapers First that accounted for the low ranking. Among the reasons were his renegade management style and his limited managerial experience. While there was clearly evidence in the record attesting to Isenbergh's skill as a salesman, particularly in securing the Disney account, there was also evidence that he was an uncooperative manager concerned more with his own personal gain than with the betterment of the company. The defendant through the testimony of Kosanke and Anthony offered Malloy's superior qualifications and enthusiasm as legitimate nondiscriminatory reasons for its decision to hire Malloy instead of Isenbergh. As a result, the presumption of discrimination which arose upon the establishment of the *prima facie* case is eliminated from consideration, and Isenbergh must have come forward with sufficient evidence to satisfy the ultimate burden of proving discrimination if the verdict is to stand. *Krieg v. Paul Revere Life Ins. Co.*, 718 F.2d 998, 999 (11th Cir.1983) (affirming the District Court's grant of judgment notwithstanding the verdict for failure to demonstrate pretext.)

In order for Isenbergh to overcome the motion for judgment n.o.v. after the defendant has offered a legitimate, nondiscriminatory reason for its action, he must establish pretext by demonstrating the employer's justification was unworthy of belief and that the employer's action was more than likely motivated by age discrimination. *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988). Isenbergh offered no evidence from which one could conclude that the reasons given for hiring Malloy instead of him were unworthy of belief. Although he claims he was enthusiastic, he did not chal-

---

14. Clearly Isenbergh presented sufficient evidence to prove his qualifications as a salesperson, but the issue to be determined in evaluating his discrimination claim is his ability to serve as a manager. This court remains unconvinced that the plaintiff carried the burden of demonstrating himself qualified to work as the manager of Newspapers First's Miami office.

lenge the determination that Malloy was more enthusiastic. Although he discussed his management skills, he did not challenge the fact that Malloy had managed more people and catered to more major market papers. He also did not challenge that Malloy was responsible for managing a larger office staff. In short, there was no evidence that the defendant offered a reason unworthy of belief for its decision.

As discussed above in conjunction with the *prima facie* case analysis, Isenbergh also failed to prove he was discriminated against. The record is devoid of any evidence that might show the reasons given for hiring Malloy were pretextual. There was no evidence that the selection process was undertaken in bad faith. The mere fact that Isenbergh disagreed with the decision made by Kosanke and Anthony does not give rise to an inference of discrimination. "[C]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [the defendant] has offered such extensive evidence of legitimate, nondiscriminatory reasons for its actions." *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir.1987) (citations omitted). The defendant has clearly overwhelmed the plaintiff's proof by its credible and legitimate justification for the decision to hire Malloy.

Isenbergh offered evidence that the ranking system had not been used before and that the criteria which were to be used in conjunction with the ranking system were devised in an imprecise manner. Clearly one inference the plaintiff would like to draw is that the selection process as it was presented by the defendant was formulated after the decision to hire Malloy was made in an effort to justify its decision by some objective measurement. Even if such an inference were supported by the evidence, which it is not, the evidence regarding the relative qualifications of the two men would be sufficient to preclude the further inference of pretext or discrimination. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir.1987). Moreover, the fact that Kosanke and Anthony were both members of the protected class makes a finding of discrimination all the

more unlikely. Kosanke was the same age as Isenbergh, and Anthony was fifty-five at the time the ranking took place. When considered along with all the other evidence in the case, this makes an inference that the ranking procedure was utilized to mask a discriminatory motive all the more unreasonable.

The fact that Isenbergh received the praise and accolades of his superiors at KRNS does not help him in establishing pretext. Proof of Isenbergh's skills as a salesman does not negate Malloy's superior skills as a manager. Moreover, the absence of any formal record of criticisms of Isenbergh's management abilities does not necessarily support a finding of pretext. *See, Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir.1989).

 When a district court finds that there is not sufficient evidence from which a jury can conclude that the reasons articulated by the defendant were merely a pretext for discrimination, or that the defendant was more than likely motivated by a discriminatory motive, it must enter judgment for the defendant, notwithstanding a jury verdict to the contrary. *Id.* This court has carefully considered the record and concludes that the jury empaneled for this case engaged in surmise and conjecture in coming to its verdict rather than basing its verdict on the evidence in the case.

In making this determination we are guided in part by *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466 (11th Cir.1991) where the Eleventh Circuit reversed the district court for failing to grant judgment notwithstanding the verdict where the plaintiff had failed to establish pretext. In *Elrod,* Sears claimed it fired the plaintiff due to allegations of sexual harassment levelled against him, but the plaintiff alleged his termination was motivated by his age. Elrod spent a great deal of energy at trial attempting to prove himself innocent of the charges, but his efforts were fruitless. The Eleventh Circuit pointed out the plaintiff's innocence of the sexual harassment charges was immaterial to the determination of the ADEA case. The essence of the discrimination claim was whether or not the defendant believed the allegations to be

true, not whether they were in fact true. The court pointed out:

> Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir.1988).... *Id.* at 1470.

Since "Elrod ha[d] offered no evidence to show that Sears' justification [was] unworthy of credence," *id.* at 1470, judgment was entered in favor of the defendant, notwithstanding the jury verdict in favor of the plaintiff.

In the matter presently before this court there is likewise no evidence to show that Newspapers First's justification for its decision to hire Malloy instead of Isenbergh was unworthy of credence. Moreover, the evidence certainly did not establish that discrimination was the real reason for the action Newspapers First took in hiring Malloy over Isenbergh. Perhaps the defendant's decision that Malloy was better qualified for the job than Isenbergh was incorrect. Even if that were so, the Eleventh Circuit dictates that no relief flows to the plaintiff where, as here, there was no evidence to prove that the defendant did not actually believe Malloy was more qualified for the position. Nothing more than a scintilla of evidence supports Isenbergh's contention that he was the victim of discrimination. This does not stand in the way of granting judgment pursuant to Fed. R.Civ.P. 50(b).

### Conclusion

For the reasons expressed herein, judgment for the defendant Newspapers First is GRANTED notwithstanding the jury verdict pursuant to Fed.R.Civ.P. 50(b).

SO ORDERED.